# DAYTON-GOOSE CREEK RAILWAY COMPANY v. UNITED STATES, INTERSTATE COMMERCE COMMISSION, ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TEXAS.

No. 330. Argued November 16, 19, 1923.—Decided January 7, 1924.

1. The power of Congress to regulate interstate commerce includes the power to foster, protect and control it, with proper regard for the welfare of those who are immediately concerned as well as of the public at large. P. 478.

2. Section 422 of the Transportation Act 1920, by the new section, 15a, added by it to the Interstate Commerce Act, directs the Interstate Commerce Commision: To establish rates which will enable the carriers, as a whole, or by rate groups or territories fixed by the Commission, to receive a fair net operating return upon the property they hold in the aggregate for use in transportation (par. 2); to establish from time to time the percentage of the value of the aggregate property constituting a fair operating return, the act, however, fixing it for the years 1920 and 1921, at 5½%, with discretion in the Commission to add one-half of 1%, as a fund for adding betterments on capital account, (par. 3); and to fix, from time to time, such aggregate property value. The said § 15a provides further: That, because it is impossible to establish uniform rates on competitive traffic, adequate to sustain all the carriers needed for the business, without giving some an income in excess of a fair return, any carrier receiving such excess shall hold it as trustee for the United States, (par. 5); that such excess shall be distributed, one-half to the carrier as a reserve fund, the other half to a general railroad revolving fund, to be maintained by the Commission, (par. 6); that the carrier may use such reserve to pay dividends, interest on securities, or rent for leased roads, to the extent that its net operating income for any year is less than 6%, (par. 7); and whenever such reserve equals 5% of the value of its property, and while it so continues, the carrier's one-half of excess

income may be used for any lawful purpose, (par. 8); that the general revolving fund shall be administered by the Commission in making loans to carriers to meet expenditures on capital account, to refund maturing securities originally issued on capital account, and for buying equipment and facilities and leasing or selling them to carriers, (pars. 10–17).

*Held:* (a) The provisions for "recapture" and use of excess income are essential to the plan of the act, which aims for an efficient national transportation system, and therein seeks to maintain uniform rates, for all shippers, as a means of distributing traffic and avoiding congestion on the stronger railroads, while keeping the net returns of the railroads, whether strong or weak, to the varying percentages that are fair for them, respectively. P. 479.

(b) Rates which, as a body, enable all the railroads necessary to do the business of a rate section, to enjoy not more than a fair net operating income on the aggregate value of their properties therein economically and efficiently operated, are, in their general level, reasonable from the standpoint of the individual shipper in that section. P. 480.

(c) The statute leaves the reasonableness of each particular rate open to inquiry independently of the net return to the carrier from all. Pp. 480, 483.

(d) A railroad, however strong financially, economical in facilities, or favorably situated as to traffic, is not entitled as of constitutional right to more than a fair, net operating income upon the value of its properties devoted to transportation. P. 481.

(e) Decisions holding that the fact that the revenue of a carrier from both local and interstate commerce gave a fair profit was irrelevant to the question whether the intrastate rates were unreasonably high or low, do not make against the use of a fair return of operating profit, as a standard of reasonableness of rates, when the issue respects the general level of all the rates received by the carrier. P. 483.

(f) The net operating profit accruing to a carrier from its whole rate structure is relevant evidence in determining whether the sum of the rates is fair to the carrier; reduction of excessive profit, as provided by the act, is tantamount to reducing the rates proportionately before collection. P. 483.

(g) Under the statute, excess income is taken in trust, and the carrier never has such a title to it as to render its recapture by the Government a taking without due process, in violation of the Fifth Amendment. P. 484.

(h) Inasmuch as the part of the excess income retained by the Government belongs equitably to neither carriers nor shippers, it may properly be devoted by the Government, as the act provides, to help the weaker railroads more effectively to discharge their public duties. P. 484.

(i) The recapture clause does not, by reducing net income from intrastate rates, invade the reserved power of the States, in violation of the Tenth Amendment, but, in view of its relation to the plan and national purpose of the act, is within the power of Congress over interstate commerce. P. 485.

(j) Absence of provision in the act itself for judicial hearing on the fairness of the return is not a constitutional objection, since the steps prescribed amount to a direct and indirect legislative fixing of rates, and resort to the courts on the question of confiscation is left open, under Jud. Code, §§ 208, 211. P. 485.

(k) Limitation of the return to 6%, on the property of a public utility, is not necessarily confiscatory. P. 486.

(l) In this case, the issue of confiscation, not having been raised in the complaining carrier's bill, is not before the Court; but, *semble,* that 8% on the property value reported by the carrier, remaining to it after paying the one-half excess income to the Commission, is not confiscatory. P. 486.

(m) To attack the return allowed, upon the ground that the property valuation upon which it was computed was too low, the bill should allege the true values. P. 486.

(n) Whether the property values reported by a carrier to the Commission, upon which its net income was calculated, were understated, is a question of fact, to be decided, primarily, at least, by the Commission, and which cannot be considered by the Court when the carrier has not invoked the Commission's decision upon it. P. 487.

287 Fed. 728, affirmed.

APPEAL from a decree of the District Court which dismissed a bill brought by the appellant Railway Company attacking the constitutionality of orders made by the Interstate Commerce Commission under the Transportation Act, and praying that the United States, the Commission and a United States district attorney be enjoined from prosecuting civil or criminal actions to enforce the orders.

*Mr. Frank Andrews* and *Mr. Robert J. Cary,* with whom *Mr. Robert H. Kelley* and *Mr. F. C. Nicodemus, Jr.,* were on the briefs, for appellant.

I. The property of appellant, held for and used in the service of transportation during the periods here involved, has remained at all times appellant's private property, protected as such by the Fifth Amendment.

The income produced by that property, and the revenues accruing from its use, are likewise private property and likewise protected. *Branson* v. *Bush,* 251 U. S. 182; *Cleveland, etc. Ry. Co.* v. *Backus,* 154 U. S. 439; *Omnia Co.* v. *United States,* 261 U. S. 502; *South Utah Mines* v. *Beaver County,* 262 U. S. 325; *Monongahela Co.* v. *United States,* 148 U. S. 312; *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *Minnesota Rate Cases,* 230 U. S. 352; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585.

II. The provisions of the Transportation Act for the disposition of net railway income are not a regulation of interstate commerce, but a direct taking of the private property of the carrier, and of the liberty of the use of the property of the carrier, without due process of law and without just compensation.

The dominant purposes of Congress were to release the railroads from governmental operation, and to prevent the transportation system of the country from being wrecked. See *Wisconsin R. R. Comm.* v. *Chicago, Burl. & Q. R. R. Co.,* 257 U. S. 563; Senate Committee Report No. 304, Senate Bill 3288. Congress was initiating a new and a different policy from any which had theretofore been recognized by national legislation. *New England Divisions Case,* 261 U. S. 184.

The contention urged in the Senate Committee report, *supra,* that Congress may " declare that the income

which any particular carrier receives beyond a fair re-turn upon the value of its property, it receives as a trustee for the public and not as its own absolute prop-erty," overlooks the elemental considerations of the powers of Congress under the Constitution.

A carrier has no right to collect, or to demand of the shipper, a rate that is not in and of itself reasonable for the service. The Commission has no right to fix, and Congress has no power to compel the shipper to pay, a rate that is not reasonable for the service. Nor may Congress take from the shipper for governmental pur-poses anything that is more than reasonable for the service. Therefore, the carrier has no right to collect an excess service charge and hold the excess as trustee for the United States. See §15a, par. 17. If the earnings of the carrier arise from reasonable charges for service rendered, such earnings are the private property of the carrier, which cannot, by congressional declaration or otherwise, be made a trust fund for the United States or for any other purpose. The taking of property of the carrier is not a regulation of commerce. Sections 5 and 6 do not regulate. They take the income of the car-rier already earned, appropriate one-half of it to the Government, and limit the uses of the other half. The limitations are as much a taking of the carrier's prop-erty as the appropriation of it direct to the Government.

Whence comes the power of Congress to make this declaration of trust? The power cannot be defended on the proposition that it is only a part of the machinery for fixing rates. The excess is not to be returned to the persons who paid excessive provisional charges; and the act itself does not authorize excessive provisional charges, but directs that charges be fixed by the Com-mission, "in the exercise of its power to prescribe just and reasonable rates." Rate regulation cannot be in-dulged in to enrich the treasury of the Government. As

it has been practiced in this country, it is, in theory at least, designed to protect shippers from unreasonably high rates and to protect carriers from unreasonably low rates.

The general level of rates, state and interstate, under which appellant's earnings accrued to it between March 1, 1920, and December 31, 1921, must be assumed to be just and reasonable and may not be assumed to be excessive.

For all practical purposes, these rates were absolutely fixed by the Commission subject to the obligation of the carriers to correct maladjustments. But it is immaterial whether they were fixed or were merely authorized, because in either event they must have received the express approval of the Commission. The discretion of the Commission with respect to such administrative matters is not subject to review by the courts.

The rates and charges under which the appellant earned the income were not excessive, and there is no basis of law or fact for assuming that they were otherwise than just, fair and reasonable; except, perhaps, where the shippers in particular instances may be entitled, under the Interstate Commerce Act, to secure from the Commission an order of reparation requiring the carrier to refund any excess which the Commission may find to have existed in those cases. But the questions of whether any excess did exist, and if so how much it was, have by law been committed exclusively to the determination of the Commission. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426.

The restrictions placed by § 15a upon the use of the moneys thereby required to be placed in a reserve fund, constitute a taking of property under the Fifth Amendment, because an undue limitation upon the use of property is equivalent under the Constitution to a seizure of

the property. *Branson* v. *Bush,* 251 U. S. 182; *Brooks-Scanlon Co.* v. *Railroad Commission,* 251 U. S. 396; *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166; *Kansas Gas Co.* v. *Haskell,* 172 Fed. 545; *West* v. *Kansas Gas Co.,* 221 U. S. 229; *St. Louis* v. *Hill,* 116 Mo. 527; *Spann* v. *Dallas,* 111 Tex. 350; *Carey* v. *Atlanta,* 143 Ga. 192; *State* v. *Darnell,* 166 N. C. 300; *Chicago, M. & S. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418; *United States* v. *Cress,* 243 U. S. 316; *United States* v. *Lynah,* 188 U. S. 445.

The " due process " clause of the Fifth Amendment requires equal legislation affecting generally and in like manner all those in similar circumstances, and to this extent the Fifth Amendment, which does not expressly contain an equal protection clause, is as broad as the Fourteenth Amendment, in which the principle is expressly stated. Taylor, Due Process, § 134; *Leeper* v. *Texas,* 139 U. S. 462; *Giozza* v. *Tiernan,* 148 U. S. 657; *Cass Co.* v. *Detroit,* 181 U. S. 396; *Tonawanda* v. *Lyon,* 181 U. S. 389; *Commodities Clause Cases,* 213 U. S. 366; *Brushaber* v. *Union Pacific R. R. Co.,* 240 U. S. 1; *Wilson* v. *New,* 243 U. S. 332.

A classification of carriers, for rate-fixing purposes, solely upon the basis of their net earnings, for performing a similar service under like conditions in the same territory, is arbitrary and unequal, and therefore takes property without due process, in violation of the Fifth Amendment. *Cotting* v. *Godard,* 183 U. S. 79.

The act deprives appellant of its property without due process by reason of the entire lack of provision for adjusting the actual earnings to the earnings as shown by the books shortly after the close of the annual accounting period. Sufficient account is not taken of deferred claims against the carrier, which should be charged against the surplus. *Sweet* v. *Rechel,* 159 U. S. 380; *Chicago, M. & St. P. Ry. Co.* v. *Wisconsin,* 238 U. S. 491.

III. The statute is unconstitutional as to appellant and therefore the orders entered in pursuance thereof are void

as a violation of the Tenth Amendment, because the re-capture provision applies to the net income which is derived from the conduct of intrastate as well as interstate and foreign business, and operates as a limitation upon the earning power of a Texas corporation with respect to its business done wholly within that State. The proper regulation of interstate and foreign commerce by Congress and its agencies has no such real or substantial relation to high or excessive earnings on purely state business as will justify any limitation upon them by the Federal Government. *Adair* v. *United States,* 208 U. S. 161; *Mondou* v. *New York, etc. R. R. Co.,* 223 U. S. 1; *Shreveport Case,* 234 U. S. 342; *Mugler* v. *Kansas,* 123 U. S. 623; *Wisconsin Rate Case,* 257 U. S. 563; *Nathan* v. *Louisiana,* 8 How. 73; *Galveston, etc. Ry. Co.* v. *Texas,* 210 U. S. 217; *Greene* v. *Louisville, etc. R. R. Co.,* 244 U. S. 499; *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Bailey* v. *Drexel Co.,* 259 U. S. 20. *Noble State Bank* v. *Haskell,* 219 U. S. 104, distinguished. See also *Keller* v. *United States,* 213 U. S. 138.

IV. Section 15a does not levy or impose a tax and is not an exercise of the taxing power of Congress. See *New England Divisions Case,* 261 U. S. 184.

V. The orders of the Commission of January 16th and March 16th, 1922, expressly direct and require that, within a fixed time, one-half of all excess earnings, shown by the reports called for in such orders, shall be paid to the Commission, and inferentially direct and require that the other one-half of the excess earnings so shown be placed in the reserve fund contemplated by § 15a.

VI. Appellant is entitled to an injunction against the penalties and prosecutions which will be inflicted upon it and its officers if it continues its refusal to observe the directions of § 15a and of the orders of the Commission respecting the payment of money to the Commission and into a reserve fund.

VII. This record shows conclusively that the true value of appellant's property, held for and used in the service of transportation during the respective periods involved, substantially exceeded the amount upon the basis of which appellant's so-called excess earnings, have been computed. Therefore, a failure to accord relief herein would result in taking, as so-called excess earnings, portions of appellant's private property not justified or required by the terms of the act in question, without due process of law, in violation of the Fifth Amendment, even if the act be held valid for all purposes. *Southwestern Bell Tel. Co.* v. *Public Service Comm.,* 262 U. S. 276.

It is alleged in the bill that the so-called value upon which the Commission computed its claim for excess earnings was not the true value of complainant's property, and, this allegation being taken as true upon defendant's motion to dismiss the bill, it necessarily follows that the lower court erred in sustaining the motion. Foster, Federal Practice, 6th ed., § 366; *Detroit United Ry.* v. *Detroit,* 248 U. S. 429; *United States* v. *Railway Employés' Dept.,* 286 Fed. 228; *Krouse* v. *Brevard Co.,* 249 Fed. 538; *Stromberg* v. *Holley,* 260 Fed. 220.

The Commission erred in arbitrarily adopting cost of road and equipment as the true value of the complainant's property, and therefore its order based thereon is unlawful, and its enforcement should be enjoined. Value is not measured by cost. *Southwestern Bell Tel. Co.* v. *Public Service Comm.,* 262 U. S. 276; *Bluefield Water Works Co.* v. *Public Service Comm.,* 262 U. S. 679; *Georgia Ry. Co.* v. *Railroad Comm.,* 262 U. S. 625; *Smyth* v. *Ames,* 169 U. S. 546.

Mr. P. J. Farrell for the Interstate Commerce Commission.

I. The orders were made by the Commission as a procedural step deemed by it necessary and appropriate for

the purpose of enforcing, in so far as with it lies, the provisions of § 15a of the Interstate Commerce Act, but do not, in and of themselves, require appellant to pay into a reserve fund or to the Commission any sum or sums of money.

II. The requirements contained in the orders are fully supported by the authority conferred upon the Commission by the act, and are in accordance with the duties imposed upon the Commission by par. 9 of § 15a.

III. Appellant is not required by either the provisions of § 15a or the orders of the Commission to include income arising from non-carrier sources in excess net railway operating income.

IV. In *Ex parte 74,* 58 I. C. C. 220, the Commission did not fix the rates, fares, and charges for the transportation of passengers and property by railroad in the group in which appellant's railroad is located.

V. In so far as changes should be made in the valuation of appellant's property, appellant is fully protected by a provision contained in the orders of the Commission. As for any payments appellant may be required to make of claims accrued during the periods covered by the orders, appellant is fully protected by special instructions contained in the Commission's "Classification of operating revenues and operating expenses of steam roads, issue of 1914, effective on July 1, 1914."

Since, in the ordinary course of business, sums of money paid by a carrier on account of claims like those referred to by appellant are included in the carrier's accounts for the years, respectively, in which the payments are made, regardless of the dates upon which the claims accrue, it appears to be a reasonable assumption that there are included in the reports made to the Commission by appellant, for the periods covered by the orders of the Commission involved in this case, sums of money paid by appellant during those periods on account of claims which accrued in some prior period or periods.

VI. Income derived by appellant from intrastate traffic may properly be included in the basis upon which appellant's excess net railway operating income is computed. *Wisconsin R. R. Comm.* v. *Chicago, B. & Q. R. R. Co.,* 257 U. S. 563.

VII. The provisions of § 15a relating to excess net railway operating income are constitutional and the orders of the Commission are valid.

As stated by this Court in the *Wisconsin Case, supra,* the end sought to be accomplished by Congress in framing the Transportation Act, including the provisions of § 15a, was to maintain an adequate national railway system. That this end is legitimate, and that the provisions referred to are appropriate and plainly adapted to that end, is equally clear. It will be seen that, in prescribing rates, the Commission is both authorized and required to use as a basis the aggregate value of the railroad property of the carriers held for and used in the service of transportation, as a whole, or as a whole in each of such rate groups or territories as the Commission may from time to time designate, instead of, and as distinguished from, the value of the property of an individual carrier. It is therefore apparent that appellant's contention, that, as between appellant and the Commission, the general level of rates in the group where appellant's railroad is located must be presumed to be reasonable, is unsound and cannot be sustained.

Regardless of the power of Congress to provide for the levying and collecting of taxes, we think it is apparent that the provisions of § 15a, whose validity is called in question by appellant, may be upheld as portions of a scheme of regulation of interstate and foreign commerce which Congress has a constitutional right to create and put in force.

*Mr. Solicitor General Beck,* with whom *Mr. Blackburn Esterline,* Assistant to the Solicitor General, was on the brief, for the United States.

Whether an adequate system of railway transportation throughout the continental United States shall be maintained and, to that end, whether the Transportation Act is a valid exercise of congressional power, is the question. Whether a particular clause of that act is constitutional when torn from its setting, is decidedly not the question.

The act stands before the Court with all of the presumptions of validity. *Nicol* v. *Ames*, 173 U. S. 509. Moreover, it has thrice been sustained in practically all of its aspects. *Wisconsin R. R. Comm.* v. *Chicago, B. & Q. R. R. Co.*, 257 U. S. 563; *Pennsylvania R. R. Co.* v. *Railroad Labor Board*, 261 U. S. 72; *New England Divisions Case*, 261 U. S. 184.

The appellant alleges itself to be a common carrier by railroad subject to the lawful provisions of the Transportation Act and all other lawful acts of Congress regulating railroads engaged in interstate and foreign commerce. Congress, therefore, has the power to regulate it. *St. Louis S. W. Ry. Co.* v. *United States*, 245 U. S. 136; *Atlantic Coast Line R. R. Co.* v. *Riverside Mills*, 219 U. S. 186.

The broad purposes of the Transportation Act are repeatedly recited throughout the act. 41 Stat. 476, 477, 482, 488, 489, 491. [Counsel reviewed the history of the times under which Congress acted and the legislative history of the Transportation Act. See *Stafford* v. *Wallace*, 258 U. S. 513.] The Congress was avowedly considering the transportation system throughout the continental United States as a whole. To hold that the Congress enacted the broad provisions to raise revenue, to prescribe divisions, to provide for settlement of disputes between carriers and their employees, and for other equally important purposes, in order to maintain an adequate transportation system, and then to annul and strike down the standard or basis for which these enormous increased revenues are to be raised and equitably distributed or

placed, would defeat the whole intention of the Congress and bring about a situation more destructive to the public interest than if no part of the act had ever been passed.

Never in its history. has Congress enacted a statute in which the sections were so closely interlocked and dependent each upon the other. If paragraphs 5 and 6 of § 422 are torn from the body of the act, the whole foundation of the entire legislative scheme fails.

In cases thus far decided, both the District Courts and this Court, in approaching the subject, have persistently exercised the judicial power with a scope coextensive with the congressional enactment, and have kept the entire act and all of the carriers subject thereto in full view at all times, to the end that all of the incidents to the development of an adequate transportation system may move forward at once and together. The statute is not to be interpreted and executed along restricted and narrow lines when dealing with such a complex and stupendous subject.

In *Wisconsin R. R. Comm.* v. *Chicago, B. & Q. R. R. Co.,* 257 U. S. 563, paragraphs 3 and 4 of § 13, and § 15a, were assailed, but this Court sustained the validity of the act in all respects. See also *Pennsylvania R. R. Co.* v. *Railroad Labor Board,* 261 U. S. 72; *New England Divisions Case,* 261 U. S. 184.

The proceedings before the Commission and in the District Court, the arguments in the briefs of counsel and at the bar, and the opinion of this Court, all show that § 15a, practically in its entirety, was involved in the *New England Divisions Case.* What this Court said concerning the so-called "recapture clause", and other paragraphs of that section, was not inadvertence, but squarely within the issues made by the parties. To sustain the contentions or any substantial part of them, now advanced by appellant and the numerous *amici curiæ,* would be to overrule the *New England Divisions Case.* The opinion in that case is just as conclusive

of the validity of the recapture paragraphs as if those paragraphs had been the immediate subject of the controversy instead of the so-called divisions paragraphs. The Commission there considered the respective needs of the several carriers in the distribution of the revenue, after it was acquired by the carriers and before the net railway operating income reached 6% of the value of the railway property held for and used by each carrier in the service of transportation. In the instant case the net has exceeded 6%. The constitutional rights of the complainant under the Transportation Act have thus been fully satisfied. The whole controversy is over the overflow. Thus, the questions disposed of in the *New England Divisions Case* reached heights far beyond anything now claimed by the appellant and the *amici curiae* under the recapture clause. If the Congress may authorize the Commission to direct the distribution among the weaker lines of much needed earnings to maintain an adequate transportation system, *a fortiori,* it may direct the recapture of excess earnings of those who have waxed fat under the Transportation Act. Swollen earnings derived from necessarily general rates for transportation, which the public must pay, are not guaranteed by the Constitution.

Paragraphs 5 and 6 may not be segregated from the paragraphs which have already been upheld. *Hill* v. *Wallace,* 259 U. S. 44; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540.

It cannot seriously be argued that paragraphs 3 and 4 of § 13, paragraph 6 of § 15, and § 15a, of the Interstate Commerce Act, as amended by the Transportation Act, are not integral parts of the machinery; that is, the raising of the revenues, the fixing of the divisions, and the recapture of the excess earnings, all stand together. Opposing counsel, therefore, are wedged between the nonsegregation of these several paragraphs,

on the one side, and the opinions of this Court in the *Wisconsin Rate Case* and the *New England Divisions Case,* on the other side.

Moreover, it is conceded that paragraphs 2, 3, and 4 of § 15a undoubtedly constitute a regulation of commerce. The argument is that unconstitutionality begins at the point at which the so-called constitutional guaranty stops.

The Commission has found the value of the steam railway property subject to the act and held for and used in the service of transportation at approximately $18,900,000,000. *Ex parte 74,* 58 I. C. C. 229. The exercise of the power of Congress, which authorizes the Commission to increase rates to the public, so as to earn a net return to each carrier of 6% on the valuation, cannot in this proceeding be successfully challenged as confiscatory. The act was passed in the public interest, which includes the interest of the carriers. *Interstate Commerce Comm.* v. *Chicago, R. I. & P. Ry. Co.,* 218 U. S. 109; *Minnesota Rate Cases,* 230 U. S. 441, 467, 471.

There are those who contend that, if all the railroads were placed in a single system, it would be unconstitutional for Congress to impose upon them a scheme of rates which would yield less than a fair return upon the aggregate value; that the instant case is not different in principle because of the separation of the railroads into different systems; therefore the recapture clause is invalid, because it takes from some roads part of their earnings and leaves to the roads in the aggregate less than the fair return upon the property in the aggregate. Congress deals with the situation as it finds it. With the railroads divided into separate systems, there is no constitutional obligation on Congress to make rates which will yield and leave in the hands of the railroads in the aggregate a fair return on the aggregate value.

Again, it has been said that the true rate-making rule is to make rates upon the basis of the average results of

all the carriers, and anything that any carrier earns under this rule is its property and cannot be taken away. Courts will not limit in this way the right of Congress to select the means of exercising its constitutional powers; nor will they declare that any given rule of rate making is the only rule. There is no reason for the courts to say that Congress is prohibited from adopting some other rule of rate making, as, for example, that rates on prosperous roads shall be only such as will yield them a fair return; in which event competition would force corresponding rates on the weak roads.

It has also been suggested that Congress has not the power to bankrupt the railroads by fixing rates for the prosperous roads which, while constitutional as to them, would, through competitive influences, leave other roads without a fair return. There can be no such operation of the constitutional principle. The Government might buy and operate a railroad between Chicago and New York and might charge exceedingly low rates. This might be disastrous to other railroads, but how could it be said that their property had been taken by legislative enactment without due process of law merely because they, as the result of competition, had been unfavorably affected by an act of the Government which in itself would be entirely lawful?

The Transportation Act was designed to help the transportation situation, and did help it. If the railroads had gone back to private control without the specific rate-making rule prescribed in the Transportation Act, the railroads could not have increased their rates to anything like the extent they were permitted to increase them under the Transportation Act. If the more fragmentary rules which had theretofore been applied had been applied to the new situation, it is perfectly clear that the net increase would have been much smaller. It would be surprising if a rule which was intended to be more liberal

in practice to the railroads, and which in fact was more liberal to them, should be regarded as unconstitutional, when the rules theretofore in effect of a more fragmentary character and affording less protection to the carriers would be regarded as constitutional.

If there are any carriers which have a constitutional right to object to the rule of the Transportation Act, they are the weaker carriers, because the act makes it practically certain that rates will not be high enough to give them a fair return. But those carriers are not objecting, and in the nature of things will not object, because the rule gives them more than they would otherwise get in practice. And it is impossible to see how carriers which are getting more than they are constitutionally entitled to, can say that the rule that gives them that amount is unconstitutional.

Decisions are legion, and Congress took notice of them in enacting the Transportation Act, on the subject of the right of carriers to earn a fair return on the value of the property used in the service of the public. See *Chicago, M. & S. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418; *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362; *Smyth* v. *Ames,* 169 U. S. 466; *Galveston Elec. Co.* v. *Galveston,* 258 U. S. 388; *Minnesota Rate Cases, supra.* Likewise with respect to the classification of railroads. *Chicago, B. & Q. R. R. Co.* v. *Iowa,* 94 U. S. 155; *Grand Trunk Ry. Co.* v. *Wellman,* 143 U. S. 339; *Dow* v. *Beidelman,* 125 U. S. 680. Each individual case must rest upon its own peculiar facts and circumstances. *Covington, etc. Co.* v. *Sandford,* 164 U. S. 578.

The principle upon which the recapture clause was founded was not unknown to our law. See *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219.

Counsel argue that the statutory half-and-half division between the Government and the company of the excess

earnings is arbitrary, and that, if sustained, it might subsequently be revised, and the proportion of the company from time to time be so reduced as to reach zero.   Similar arguments in other cases have been rejected as irrelevant.  *Atlantic Coast Line R. R. Co.* v. *Corporation Comm.,* 206 U. S. 1; *Noble State Bank* v. *Haskell,* 219 U. S. 104.

Likewise the argument may not prevail that appellant, owing to claims and suits for loss and damage, overcharges, etc., may not close records and submit reports of earnings for a specified year because of undetermined liability, as it presents a general administrative question which clearly belongs to the rules and regulations of the Interstate Commerce Commission covering such matters. The Court would not determine such questions in advance of the facts of the particular case.

Opposing counsel try to make much of the language of the District Court that the recapture of the excess earnings was in the nature of a tax.   One of the briefs points out that the Interstate Commerce Commission has not become a tax assessor and collector, that, as the moneys are not paid into the Treasury by the carriers and paid out by the Treasurer, there is no tax, hence the District Court erred.   The tax referred to in the *New England Divisions Case,* is very much the same as the tax referred to in the *Mountain Timber Case.*   The point does not require further discussion.

There is little in the briefs of opposing counsel which meets the holding of the District Court that appellant never acquired title to the fund as its absolute property but that it holds the same as trustee for the United States.

The Transportation Act does not interfere with intrastate commerce.   *Wisconsin Rate Case,* 257 U. S. 587.

Mr. *Samuel W. Moore,* by leave of Court, filed a brief for the Kansas City Southern Railway Company, as *amicus curiae.*

Messrs. *Joseph Paxton Blair, Edgar H. Boles, John F. Bowie, Robert J. Cary, Henry W. Clark, Herbert Fitzpatrick, Lawrence Greer, W. S. Horton, William S. Jenney, E. W. Knight, Richard V. Lindabury, Will H. Lyford, Samuel W. Moore, William Church Osborn, Winslow S. Pierce, Henry V. Poor, John H. Agate* and *Carl A. de Gersdorff,* by leave of Court, filed a brief for the numerous railroad companies named in the footnote, *post,* 475, as *amici curiae.*

*Mr. Winslow S. Pierce, Mr. Lawrence Greer* and *Mr. F. C. Nicodemus, Jr.,* by leave of Court, filed a brief for the Wabash Railway Company, the Western Maryland Railway Company, and the St. Louis Southwestern Railway Company, as *amici curiae.*

*Mr. John G. Milburn* and *Mr. Forney Johnston,* by leave of Court, filed a brief for the National Association of Owners of Railroad Securities, as *amici curiae.*

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

The main question in this case is whether the so-called " recapture " paragraphs of the Transportation Act of 1920, c. 91, § 422, § 15a, paragraphs 5–17, 41 Stat. 456, 489–491, are constitutional.

The Dayton-Goose Creek Railway Company is a corporation of Texas, engaged in intrastate, interstate and foreign commerce. Its volume of intrastate traffic exceeds that of its interstate and foreign traffic. · In response to orders of the Interstate Commerce Commission, the carrier made returns for ten months of 1920, and for the full year of 1921, reporting the value of its railroad property employed in commerce and its net revenue therefrom. It earned $21,666.24 more than six per cent. on the value of its property in the ten months of 1920, and $33,766.99

excess in the twelve months of 1921. The Commission requested it to report what provision it had made for setting up a fund to preserve one-half of these excesses, and to remit the other half to the Commission.

The carrier then filed the present bill, setting forth the constitutional invalidity of the recapture provisions of the act and the orders of the Commission based thereon, averring that it had no adequate remedy at law to save itself from the irreparable wrong about to be done to it by enforcement of the provisions, and praying that the defendants, the United States, the Interstate Commerce Commission, and the United States District Attorney for the Eastern District of Texas, be temporarily restrained from prosecuting any civil or criminal suit to enforce the Commission's orders, and that the court on final hearing make the injunction permanent. The Commission answered the bill. The United States and the District Attorney moved to dismiss it for want of equity jurisdiction, and for lack of equity. An application for an interlocutory injunction before a court of three judges under the Act of October 22, 1913, c. 32, 38 Stat. 208, 220, was denied and the court, proceeding to consider the equities, dismissed the bill.

The question of equity jurisdiction raised below has not been discussed here by counsel for the appellees either upon their briefs or in oral argument. They do not rely on it, but seek without delay a decision on the merits.

While the Dayton-Goose Creek Railway Company was the sole complainant below and is the sole appellant here, nineteen other railway companies have, as *amici curiae*, upon leave granted, filed briefs in support of its appeal. Their names appear in the margin.[1]

---

[1] Southern Pacific Company; Lehigh Valley Railroad Company; Western Pacific Railroad Corporation; New York Central Railroad Company; Union Pacific Railroad Company; Chesapeake & Ohio Railway Company; Western Maryland Railway Company; Illinois

By § 422 of the Transportation Act, there was added to
the existing Interstate Commerce Act and its amend-
ments, § 15a. The section in its second paragraph directs
the Commission to establish rates which will enable the
carriers, as a whole or by rate groups or territories fixed
by the Commission, to receive a fair net operating return
upon the property they hold in the aggregate for use in
transportation. By paragraph 3, the Commission is to
establish from time to time and make public the percent-
age of the value of the aggregate property it regards as a
fair operating return, but for 1920 and 1921 such a fair
return is to be five and a half per cent., with discretion in
the Commission to add one-half of one per cent. as a fund
for adding betterments on capital account. By para-
graph 4, the Commission is to fix the aggregate value of
the property from time to time, using in doing so the re-
sults of its valuation of the railways as provided in § 19a
of the Interstate Commerce Act, so far as they are avail-
able, and all the elements of value recognized by the law
of the land for rate-making purposes, including so far as
the Commission may deem it proper, the investment ac-
count of the railways.

Paragraph 5 declares that, because it is impossible to
establish uniform rates upon competitive traffic which
will adequately sustain all the carriers needed to do the
business, without giving some of them a net income in
excess of a fair return, any carrier receiving such excess
shall hold it in the manner thereafter prescribed as
trustee for the United States. Paragraph 6 distributes

Central Railroad Company; Delaware, Lackawanna & Western Rail-
road Company; Virginian Railway Company; Duluth, Missabe &
Northern Railway Company; Chicago & Eastern Illinois Railway
Company; Kansas City Southern Railway Company; El Paso &
Southwestern Railroad Company; St. Louis Southwestern Railway
Company and Wabash Railway Company; Pere Marquette Railway
Company; New York, Chicago & St. Louis Railroad Company; and
the New Orleans, Texas & Mexico Railway Company.

the excess, one-half to a reserve fund to be maintained by the carrier, and the other half to a general railroad revolving fund to be maintained by the Commission. Paragraph 7 specifies the only uses to which the carrier may apply its reserve fund. They are the payment of interest on bonds and other securities, rent for leased lines, and the payment of dividends, to the extent that its operating income for the year is less than six per cent. When the reserve fund equals five per cent. of the value of the railroad property, and as long as it continues to do so, the carrier's one-half of the excess income may be used by it for any lawful purpose. Under paragraph 10, and subsequent paragraphs, the general railroad revolving fund is to be administered by the Commission in making loans to carriers to meet expenditures on capital account, to refund maturing securities originally issued on capital account and for buying equipment and facilities and leasing or selling them to carriers.

This Court has recently had occasion to construe the Transportation Act. In *Wisconsin R. R. Commission* v. *C. B. & Q. R. R. Co.*, 257 U. S. 563, it was held that the act in seeking to render the interstate commerce railway system adequate to the country's needs had, by §§ 418 and 422, conferred on the Commission valid power and duty to raise the level of intrastate rates when it found that they were so low as to discriminate against interstate commerce and unduly to burden it. In the *New England Divisions Case*, 261 U. S. 184, it was held that under § 418 the Commission in making division of joint rates between groups of carriers might in the public interest consult the financial needs of a weaker group in order to maintain it in effective operation as part of an adequate transportation system, and give it a greater share of such rates if the share of the other group was adequate to avoid a confiscatory result.

In both cases it was pointed out that the Transportation Act adds a new and important object to previous interstate commerce legislation, which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged.

It was insisted in the two cases referred to, and it is insisted here, that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that when these objects are attained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety. *The Daniel Ball*, 10 Wall. 557, 564; *County of Mobile* v. *Kimball*, 102 U. S. 691, 696, 697; *California* v. *Pacific R. R. Co.*, 127 U. S. 1, 39; *Wilson* v. *Shaw*, 204 U. S. 24, 33; *Second Employers' Liability Cases*, 223 U. S. 1, 47; *Luxton* v. *North River*

*Bridge Co.,* 153 U. S. 525, 529. Mr. Justice Bradley, speaking for the Court in *California* v. *Pacific R. R. Co.* (p. 39), said:

" The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. . . . This power in former times was exerted to a very limited extent, the Cumberland or National road being the most notable instance. . . . But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed and led to the conclusion that Congress has plenary power over the whole subject."

If Congress may build railroads under the commerce clause, it may certainly exert affirmative control over privately owned railroads, to see that such railroads are equipped to perform, and do perform, the requisite public service.

Title IV of the Transportation Act, embracing §§ 418 and 422, is carefully framed to achieve its expressly declared objects. Uniform rates enjoined for all shippers will tend to divide the business in proper proportion so that, when the burden is great, the railroad of each carrier will be used to its capacity. If the weaker roads were permitted to charge higher rates than their competitors, the business would seek the stronger roads with the lower rates, and congestion would follow. The directions given to the Commission in fixing uniform rates will tend to put them on a scale enabling a railroad of average efficiency among all the carriers of the section to earn the prescribed maximum return. Those who earn more must hold one-half of the excess primarily to preserve their sound economic condition and avoid wasteful expenditures and

unwise dividends. Those who earn less are to be given help by credit secured through a fund made up of the other half of the excess. By the recapture clauses Congress is enabled to maintain uniform rates for all shippers and yet keep the net returns of railways, whether strong or weak, to the varying percentages which are fair respectively for them. The recapture clauses are thus the key provision of the whole plan.

Having regard to the property rights of the carriers and the interest of the shipping public, the validity of the plan depends on two propositions.

First. Rates which as a body enable all the railroads necessary to do the business of a rate territory or section, to enjoy not more than a fair net operating income on the aggregate value of their properties therein economically and efficiently operated, are reasonable from the standpoint of the individual shipper in that section. He with every other shipper similarly situated in the same section is vitally interested in having a system which can do all the business offered. If there is congestion, he suffers with the rest. He may, therefore, properly be required in the rates he pays to share with all other shippers of the same section the burden of maintaining an adequate railway capacity to do their business. This conclusion makes it unnecessary to discuss the question mooted whether shippers are deprived of constitutional rights when denied reasonable rates.

It should be noted that, in reaching a conclusion, upon this first proposition, we are only considering the general level of rates and their direct bearing upon the net return of the entire group. The statute does not require that the net return from all the rates shall affect the reasonableness of a particular rate or a class of rates. In such an inquiry, the Commission may have regard to the service done, its intrinsic cost, or a comparison of it with other rates, and need not consider the total net return at all. Paragraph 17 of § 15a, makes this clear:

" The provisions of this section shall not be construed as depriving shippers of their right to reparation in case of overcharges, unlawfully excessive or discriminatory rates, or rates excessive in their relation to other rates, but no shipper shall be entitled to recover upon the sole ground that any particular rate may reflect a proportion of excess income to be paid by the carrier to the Commission in the public interest under the provisions of this section."

This last clause only prevents the shipper from objecting to a particular rate otherwise reasonable, on the ground that the net return from the whole body of rates is in excess of a fair percentage of profit, a circumstance that was never relevant in such an inquiry, as hereafter shown.

Second. The carrier owning and operating a railroad, however strong financially, however economical in its facilities, or favorably situated as to traffic, is not entitled as of constitutional right to more than a fair net operating income upon the value of its properties which are being devoted to transportation. By investment in a business dedicated to the public service the owner must recognize that, as compared with investment in private business, he can not expect either high or speculative dividends but that his obligation limits him to only fair or reasonable profit. If the company owned the only railroad engaged in transportation in a given section and was doing all the business, this would be clear. If it receives a fair return on its property, why should it make any difference that other and competing railroads in the same section are permitted to receive higher rates for a service which it costs them more to render and from which they receive no better net return? Classification of railways in the matter of adjustment of rates has been sustained in numerous cases. In the *Minnesota Rate Cases,* 230 U. S. 352, 469, 473, it was held that the rates imposed by the State upon two railways were not confiscatory but that they were so in

74308°—24——31

the case of a third railway performing service in the same
territory, because the latter was put to greater expense
in rendering the service. An injunction was refused to the
first two railways and was granted to the third. The same
principle has been upheld in analogous cases. *Chicago,
Burlington & Quincy R. R. Co.* v. *Iowa,* 94 U. S. 155; *Dow*
v. *Beidelman,* 125 U. S. 680; *Chicago & Grand Trunk Ry.
Co.* v. *Wellman,* 143 U. S. 339; *Interstate Commerce Com-
mission* v. *Union Pacific R. R. Co.,* 222 U. S. 541, 549, 551;
*Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585,
599, *et seq.*

It is argued that to cut down the operating profit of the
stronger roads to a certain per cent. is not cutting or re-
ducing rates, since the net income of a carrier has no
proper relation to rates and can not be used as evidence
of their reasonableness. *Northern Pacific Ry. Co.* v.
*North Dakota,* 236 U. S. 585, and *Interstate Commerce
Commission* v. *Union Pacific R. R. Co.* 222 U. S. 541, are
cited to this point. They merely decide that where the
reasonableness of one rate or a class of rates is in issue, the
total operating profit of the railroad or public utility is
of little use in reaching a conclusion. This is shown by
the words of Mr. Justice Lamar, speaking for the Court,
in *Interstate Commerce Commission* v. *Union Pacific
R. R. Co.* (p. 549):

"Where the rates as a whole are under consideration,
there is a possibility of deciding, with more or less cer-
tainty, whether the total earnings afford a reasonable re-
turn. But whether the carrier earned dividends or not
sheds little light on the question as to whether the rate on
a particular article is reasonable. For, if the carrier's
total income enables it to declare a dividend, that would
not justify an order requiring it to haul one class of goods
for nothing, or for less than a reasonable rate. On the
other hand, if the carrier earned no dividend, it would not
have warranted an order fixing an unreasonably high rate
on such article."

There is nothing in the act requiring the use of the net return as evidence to fix a particular rate. As we have already pointed out, paragraph 17, § 15a, gives fullest latitude for evidence on such an issue.

Reliance is also had on decisions of this Court in cases where the question was of the reasonableness of state rates, and it was held that evidence to show that the revenue of the carrier from both state and interstate commerce gave a fair profit, was not relevant. The State can not justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and on the other hand the carrier can not justify unreasonably high rates on domestic business on the ground that only in that way is it able to meet losses on its interstate business. *Minnesota Rate Cases,* 230 U. S. 352, 435; *Smyth* v. *Ames,* 169 U. S. 466, 541. But this conclusion does not make against the use of a fair return of operating profit as a standard of reasonableness of rates when the issue is as to the general level of all the rates received by the carrier.

The reduction of the net operating return provided by the recapture clause is, as near as may be, the same thing as if rates had all been reduced proportionately before collection. It is clearly unsound to say that the net operating profit accruing from a whole rate structure is not relevant evidence in determining whether the sum of the rates is fair. The investment is made on the faith of a profit, the profit accrues from the balance left after deducting expenses from the product of the rates, and the assumption is that the operation is economical and the expenditures are reasonably necessary. If the profit is fair, the sum of the rates is so. If the profit is excessive, the sum of the rates is so. One obvious way to make the sum of the rates reasonable so far as the carrier is concerned is to reduce its profit to what is fair.

We have been greatly pressed with the argument that the cutting down of income actually received by the carrier for its service to a so-called fair return is a plain appropriation of its property without any compensation, that the income it receives for the use of its property is as much protected by the Fifth Amendment as the property itself. The statute declares the carrier to be only a trustee for the excess over a fair return received by it. Though in its possession, the excess never becomes its property and it accepts custody of the product of all the rates with this understanding. It is clear, therefore, that the carrier never has such a title to the excess as to render the recapture of it by the Government a taking without due process.

It is then objected that the Government has no right to retain one-half of the excess, since, if it does not belong to the carrier, it belongs to the shippers and should be returned to them. If it were valid, it is an objection which the carrier can not be heard to make. It would be soon enough to consider such a claim when made by the shipper. But it is not valid. The rates are reasonable from the standpoint of the shipper as we have shown, though their net product furnishes more than a fair return for the carrier. The excess caused by the discrepancy between the standard of reasonableness for the shipper and that for the carrier due to the necessity of maintaining uniform rates to be charged the shippers, may properly be appropriated by the Government for public uses because the appropriation takes away nothing which equitably belongs either to the shipper or to the carrier. Yet it is made up of payments for service to the public in transportation, and so it is properly to be devoted to creating a fund for helping the weaker roads more effectively to discharge their public duties. Indirectly and ultimately this should benefit the shippers by bringing the weaker roads nearer in point of

economy and efficiency to the stronger roads and thus making it just and possible to reduce the uniform rates.

The third question for our consideration is whether the recapture clause, by reducing the net income from intrastate rates, invades the reserved power of the States and is in conflict with the Tenth Amendment. In solving the problem of maintaining the efficiency of an interstate commerce railway system which serves both the States and the Nation, Congress is dealing with a unit in which state and interstate operations are often inextricably commingled. When the adequate maintenance of interstate commerce involves and makes necessary on this account the incidental and partial control of intrastate commerce, the power of Congress to exercise such control has been clearly established. *Minnesota Rate Cases*, 230 U. S. 352, 432, 433; *Illinois Central R. R. Co.* v. *Behrens*, 233 U. S. 473, 477; *The Shreveport Case*, 234 U. S. 342, 351; *Illinois Central R. R. Co.* v. *State Public Utilities Comm.*, 245 U. S. 493, 506; *Wisconsin Railroad Commission* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563. The combination of uniform rates with the recapture clauses is necessary to the better development of the country's interstate transportation system as Congress has planned it. The control of the excess profit due to the level of the whole body of rates is the heart of the plan. To divide that excess and attempt to distribute one part to interstate traffic and the other to intrastate traffic would be impracticable and defeat the plan. This renders indispensable the incidental control by Congress of that part of the excess possibly due to intrastate rates which if present is indistinguishable.

It is further objected that no opportunity is given under § 15a for a judicial hearing as to whether the return fixed is a fair return. The steps prescribed in the act constitute a direct and indirect legislative fixing

of rates. No special provision need be made in the act for the judicial consideration of its reasonableness on the issue of confiscation. Resort to the courts for such an inquiry exists under §§ 208 and 211 of the Judicial Code. It is only where such opportunity is withheld that a provision for legislative fixing of rates violates the Federal Constitution. *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287.

The act fixes the fair return for the years here involved, 1920 and 1921, at five and a half per cent. and the Commission exercises its discretion to add one-half a per cent. The case of *Bluefield Water Works & Improvement Co.* v. *Public Service Commission,* 262 U. S. 679, is cited to show that a return of six per cent. on the property of a public utility is confiscatory. But six per cent. was not found confiscatory in *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 48, 50; in *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 670; or in *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 172. Thus the question of the minimum of a fair percentage on value is shown to vary with the circumstances. Here we are relieved from considering the line between a fair return and confiscation, because under the provisions of the act and the reports made by the appellant the return which it will receive after paying one-half the excess to the Commission will be about eight per cent. on the reported value. This can hardly be called confiscatory. Moreover the appellant did not raise the issue of confiscation in its bill and it can not properly be said to be before us.

It is also said in argument that the value of the carrier's property upon which the net income was calculated was too low and was unfair to the carrier. The value of property, it is argued, really depends on the profit to be expected from its use, and should be calculated on the income from rates prevailing when the law was passed which

must be presumed to have been reasonable. The true value of the carrier's property would thus be shown to be so. much higher than reported, that the actual return would be not higher than six per cent. of it and there would be no excess.

We do not think that, with the record as it is, such an argument is open to the appellant. It did allege that the values upon which the return was estimated were not the true values, but it did not allege what the true values were. This was not good pleading and did not properly tender the issue on the question of value. Under orders of the Commission, the carrier itself reported the values of its properties for 1920 and 1921, upon which the excesses of income were calculated. The bill averred that a return of these particular values was required under the orders of the Commission. This statement is not borne out by the orders themselves. They gave the carrier full opportunity to report any other values and to support them by evidence. This it did not do. We can not consider an issue of fact that was primarily at least committed by the act to the Commission, when the carrier has not invoked the decision of that tribunal.

*The decree of the District Court is affirmed.*