## DETROIT TERMINAL R. CO. v. PENNSYLVANIA-DETROIT R. CO. et al.

(District Court, E. D. Michigan, S. D. March 9, 1925.)

No. 678.

**Railroads** ⚖️**7—Completion of belt line held not "extension" within Transportation Act.**

Where a projected railroad line, which included a belt line in and around a city, was commenced in 1917, and had been completed to a certain point, and right of way secured for and grading done on portions of the belt line prior to the passage of the Transportation Act, completion of the belt line was not an "extension" or the construction of a new line, within the meaning of Interstate Commerce Act, § 1 (18), as amended by Transportation Act Feb. 28, 1920, § 402 (Comp. St. Ann. Supp. 1923, § 8563), and no certificate of public convenience and necessity from the Interstate Commerce Commission is required therefor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Extend—Extension.]

In Equity. Suit by the Detroit Terminal Railroad Company against the Pennsylvania-Detroit Railroad Company and another. Decree for defendants.

Bill in equity to restrain defendants from continuing construction of a belt line in and around the city of Detroit without first obtaining from the Interstate Commerce Commission a certificate of convenience and necessity.

The Pennsylvania-Detroit Railroad Company was incorporated under the laws of Michigan February 27, 1917. Its articles provide for a line of railroad extending from a point on the Ohio-Michigan state line to

Carlton, Mich., a distance of 25 miles, thence to passenger and freight stations in Detroit, a distance of 26 miles, and also from points in connection with the projected line at or near the River Rouge, partly through and partly around the city of Detroit to points on the Detroit river, a distance of 26 miles, more or less. On March 21, 1917, it filed with the Michigan Railroad Commission, pursuant to Michigan statutes, a map showing a proposed line of railroad from Carlton, Mich., to Oakman boulevard, city of Detroit, (Oakman boulevard being a north and south street lying west of Woodward avenue, and approximately three-quarters of a mile from it and the Ford Motor Company Highland Park plant). This map showed a crossing of the Detroit Terminal Railroad at a point west of Livernois avenue (Livernois avenue being a street running northeasterly, and crossing the proposed line of railroad approximately 1½ miles west of its intersection with Oakman boulevard). The map was approved by the Michigan Railroad Commission April 6, 1917, except as to the manner in which crossings shown thereon should be made. The present railroad of the Detroit-Pennsylvania Railroad ends at a point west of Livernois avenue and north of the Detroit Terminal Railroad. No part of the line has ever been constructed between that point and Oakman boulevard.

On July 23, 1923, the Pennsylvania-Detroit Railroad made application for the approval of a map for a proposed extension or continuation of its existing railroad from a point west of Livernois avenue and north of the Detroit Terminal Railroad, crossing the latter tracks and right of way at that point, and thence proceeding easterly adjoining and parallel with the railroad of the Detroit Terminal on its southerly track, to a point near and west of Hamilton boulevard, at which point it is proposed to cross the tracks and right of way of the Detroit Terminal and proceed along adjoining and parallel with the right of way and tracks of the Terminal on its northerly side to Dequindre street (a street east of Woodward avenue and the Ford Motor Company plant), and then departing from the immediate vicinity of the Detroit Terminal's right of way parallel and not far distant from its railroad to Dodge Bros.' plant near Van Dyke avenue, in the northeastern section of Detroit. The proposed extension or continuation adjoins and parallels the Detroit Terminal a distance of approximately 3 miles, and thereafter parallels the Terminal at a distance

of about 400 feet to Ryan road; then swings in an arc to Van Dyke avenue, where it again parallels the Detroit Terminal to what is known as Dodge Bros.' recoil plant, being at its farthest point 1½ miles from the Detroit Terminal Railroad.

Upon a hearing on this application before the Michigan Public Utilities Commission, successor to the Michigan Railroad Commission, the Detroit Terminal Railroad Company and other railroads objected to the proceedings on the ground that no certificate of convenience and necessity had first been obtained from the federal Interstate Commerce Commission, as required by the Interstate Commerce Act as amended. Over such objections the Michigan Commission approved the map on January 10, 1924, on the ground that its sole duty was to determine whether its street crossings were at points safe for the public. Subsequently the Pennsylvania-Detroit Railroad Company petitioned the Commission to specify the manner in which crossings should be made over the Detroit Terminal Railroad Company's tracks. The Detroit Terminal thereupon, on February 5, 1924, filed this bill to enjoin construction and operation, the crossing of its tracks, and the prosecution by the defendant of its petition to the Michigan Public Utilities Commission. A preliminary injunction enjoined defendants in all respects except in respect to prosecuting the petition before the Commission. Thereafter, on April 11, 1924, the Commission ordered a full interlocker at the Hamilton avenue crossing and a one-half interlocker at the Livernois avenue crossing; requiring the Pennsylvania-Detroit Railroad Company to pay the cost of initial construction, and dividing the maintenance equally between that road and the Detroit Terminal Railroad.

Since January 1, 1923, the Pennsylvania-Detroit Railroad has been leased to the Pennsylvania Railroad Company by authority of the Interstate Commerce Commission, and is now being operated as a part of the Pennsylvania Railroad Company's system. Both the Pennsylvania Railroad Company and the Pennsylvania Detroit Railroad Company are admittedly being operated in part at least in interstate commerce. The jurisdictional facts, both as to the subject-matter and the amount in controversy, have been established, and are not questioned by the defendant.

John J. Danhof, Jr., of Detroit, Mich. (H. R. Martin and Frank Robson, both of Detroit, Mich., of counsel), for plaintiff.

Charles W. Nichols, of Lansing, Mich., and Clifton G. Dyer, of Detroit, Mich., for defendants.

SIMONS, District Judge (after stating the facts as above). To the contention advanced by the plaintiff that the defendants should not be permitted to construct and operate the proposed line without a certificate of convenience and necessity being first obtained from the Interstate Commerce Commission the defendants reply:

(1) That the certificate of convenience and necessity is not required because the proposed construction is not an extension of the line of railroad within the meaning of section 1, paragraph 18, of the Interstate Commerce Act, as amended by section 402 of the Transportation Act of 1920 (Comp. St. Ann. Supp. 1923, § 8563), but that it is merely the completion of a single project entered upon and substantially completed prior to the passage of the Transportation Act of 1920 (41 Stat. 474).

(2) That, in so far as the proposed line may be operated in intrastate commerce, to such extent no certificate of convenience and necessity is required under the Transportation Act of 1920, and that, if the statute is to be construed so as to require a certificate in such case, it is unconstitutional as being an unwarranted interference by the federal government with intrastate commerce.

In approaching the consideration of the issues thus presented, my attention is directed at the outset to the text of the applicable provisions of the Transportation Act of 1920. Section 402 of that act reads as follows:

"After ninety days after this paragraph takes effect no carrier by railroad subject to this act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public conven-

ience and necessity permit of such abandonment."

The provisions of the act above quoted became operative on May 28, 1920. Three days prior to the effective date thereof the Interstate Commerce Commission issued a notice in respect thereto, the substance of which, as stated in McVeagh, Transportation Act of 1920, p. 224, is as follows:

"Inquiries have been made of the Commission as to whether or not certificates of convenience and necessity are required in cases where the extension or construction has been undertaken but the work has not been completed on May 28, 1920.

"The Commission holds that, if the projected extension or construction is actually undertaken in good faith on or before ninety days after the approval of the Transportation Act of 1920, by a carrier subject to the interstate commerce act which will operate the line, certificate will not be required of such carrier either for extension or construction or for acquirement, operation, or engaging in transportation under the act, but the undertaking must embrace not merely purpose or intent to extend or construction, but also the actual doing in good faith of acts calculated to completely effect such purpose.

"All carriers contemplating or engaged in such work should immediately notify the Commission of all the facts and circumstances connected therewith in order that the Commission may determine whether or not the work has been actually undertaken as contemplated by the act and whether or not a certificate of convenience and necessity will be required.

"The Commission further holds that the mere provision in a charter or prospectus, or the making of a preliminary survey for the extension or construction of a line of railroad, does not constitute an undertaking of such extension or construction, and that where a line of railroad has been constructed by a carrier, corporation or other person, not subject to the act, a certificate of convenience and necessity will be required before the line may be acquired or operated by a carrier subject to the act and before any carrier may engage in transportation under the act over or by means of such additional or extended line of railroad."

In determining whether the proposed construction is a new undertaking, or an extension, as claimed by the plaintiff, I am asked to consider a mass of evidence tending to show what the defendant's line of railroad was as originally planned; whether the defendants, before the act went into effect, had

actually done in good faith acts calculated to completely effect the construction of the line as planned, and whether any part of the original plan had been abandoned. It is the plaintiff's position that the construction proposed east of Livernois avenue is a new undertaking, or, an extension subject to the terms of the Transportation Act; that, if it is not so construed, no extension of any existing railroad could be brought under the terms of the act, nearly every important railroad having at some time or other considered plans for various extensions and continuations prior to the passage of the act of 1920.

Having clearly in mind that the Congress by the passage of the Transportation Act of 1920 made a new departure in railroad policy, entailing new duties upon and creating new rights for interstate carriers, and that among the objects of the new legislation is the prevention of abuses arising from excessive or discriminatory rates, the insuring of an adequate transportation service, and also a fair return on capital devoted to transportation (Wisconsin Railroad Commission v. Railroad Co., 257 U.S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Akron, etc., Railroad Co. v. United States, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Lambert & Co. v. Baltimore, etc., Railroad Co., 258 U. S. 377, 42 S. Ct. 349, 66 L. Ed. 671; Dayton, Goose Creek Ry. Co. v. United States et al., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472), I must also keep in mind that this new policy related to new undertakings, and not to constructions and extensions begun prior to the effective date of the act, and prior to the expiration of 90 days after such effective date. This seems to be the interpretation put upon the statute and justified by its language by the Interstate Commerce Commission, not only in its notice of May 25, 1920, quoted supra, but also in those subsequent decisions of the Commission, wherein it appears that attention was given to the question as to whether a given construction, or extension, was or was not a new undertaking. In re Application of Uvalde & Northern Railway Co., 67 Interst. Com. Com'n R. 554; In re Application of Gulf Ports Terminal Railway Co., 70 Interst. Com. Com'n R. 358; on rehearing, 71 Interst. Com. Com'n R. 759.

With these considerations in mind, it seems to me important to consider and to ascertain just what was the project planned and entered upon by the Pennsylvania Railroad Company in relation to its entrance into Detroit prior to the passage of the Transportation Act. As bearing upon the extent of that project, the details of its inception and the history of its development become not only pertinent but extremely important, and are not in my judgment immaterial to the issues involved, as claimed by the plaintiff. With this in mind I have reviewed carefully the entire record, and I find it impossible to escape the conclusion that the undertaking begun by the Pennsylvania Railroad, and now sought to be completed by the Pennsylvania-Detroit Railroad, was an undertaking to build a line from the Ohio boundary into Detroit, and a belt line in and around Detroit to the valley of Connors creek on the east side of the city; that there was only one project, and that substantially there has been no change in the project, either as contemplated or as carried out, in so far as it has been carried out; that all of the various elements of the undertaking are so interrelated, and so dependent, one upon the other, that the plan would never have been conceived, or, having been conceived, begun, unless the whole undertaking could reasonably have been expected to be brought to completion substantially as originally planned.

The history of the Pennsylvania undertaking begins back in May, 1912, when a delegation consisting of the mayor, councilmen, and members of the board of commerce of Detroit represented to the Pennsylvania Company that the city lacked adequate transportation facilities, especially terminal facilities. The matter was later taken up by the company, and a delegation of its officials reported that it was necessary that a belt line be built in order to get sufficient business to warrant entrance into the city. In 1916 an agreement was entered into by the Pennsylvania with the Pere Marquette Railway receivers, whereby the Pennsylvania obligated itself to build a line into and construct a line in and around the city of Detroit. Prior to the execution of this agreement the Pennsylvania advisory board recommended the line from Toledo to Detroit, and also a belt line beginning at Delray on the west, and extending around the city to the Detroit river on the east, in the neighborhood of Connors creek, and recommended the incorporation of the Pennsylvania-Detroit Railroad Company under the laws of Michigan to build such line. The Pennsylvania-Detroit Railroad Company was incorporated February 27, 1917. Its charter covers not only the line into Detroit, but a belt line in and around the city for 26 miles to points on the Detroit river. Meanwhile various routes were considered for the belt line, and blueprints made thereof. The route

finally adopted from Woodward avenue east is substantially the route now sought to be completed, except for a change therein designed to reach the so-called Dodge Recoil Plant on the east side of the city, constructed for the purpose of making munitions during the war. During this period the Pennsylvania-Detroit Railroad Company had been actively engaged in securing right of way and yards, and had begun construction work west of Detroit in connection with its entrance into the city. In the fall of 1917, when the Railroad Administration took over the control and operation of all railroads, the right of way into the city had been practically secured, grading done, some trackage laid, and the bridge begun over the Huron river. On the route of the proposed belt line some 250 to 300 lots had been purchased east of the Ford Motor Company, a right of way secured through the north end of Mt. Olivet Cemetery, and about 30 acres of land obtained for yard purposes. Negotiations had been entered into with the Ford Motor Company for the location of the belt line through its property. Approximately $500,000 had been spent for right of way and property east of the Ford Motor Company. During the government control of the railroads the main line was completed and the belt line finished as far as Livernois avenue, with gradings east to Oakman boulevard. Agreements were entered into with various industries on the east side of the city premised upon the completion of the belt line as originally planned. After the return of the railroads to private ownership, there was considerable delay owing to the necessity of entering into a new agreement with the Pere Marquette Railroad, and because of other seemingly substantial reasons. There is no evidence in the record that the belt line as originally planned has ever been abandoned.

It seems perfectly clear to any reasonable mind that the building of a line around the city to either Livernois avenue or Oakman boulevard in a region where there were at the time few, if any, important industries, without continuing the line a short distance further to the Ford Motor Company's plant, and east thereof to the many large industries on the east side of the city, would have been the height of folly, and not to be conceived as having been undertaken by experienced railroad men. This was evidently the conclusion of the Michigan Public Utilities Commission when, on January 10, 1924, it declared in its order upon the application of the company to designate its crossings with the Detroit Terminal:

"It was very evident at the time of the hearing on April 3, 1917, that the Pennsylvania-Detroit Railroad intended at a later date to ask to be permitted to extend its lines easterly from Oakman avenue."

To hold now that the Livernois end of the belt line is the terminus of the original undertaking and the remainder of the belt line an extension now sought to be made would be a holding not only unsustained by the evidence, but would vitiate that essential object of the Transportation Act which aims at insuring a fair return on capital devoted to transportation.

Even considering the construction of that part of the belt line from Livernois or from Oakman boulevard east as a project separate and distinct from the building of the main line, and that portion of the belt line already constructed, there is not wanting in the record substantial evidence to indicate that such undertaking had been entered upon prior to the passage of the Transportation Act, and that the defendants had actually done in good faith acts calculated to completely effect construction of such portion of the line as planned. But I am not called upon to base this decision upon such interpretation. I find nothing in the record to indicate such a division of the original undertaking, but, as indicated heretofore, all of the evidence shows that the project was one project, fully planned, actually entered upon, substantially completed in part, and now sought to be fully completed substantially as originally undertaken. This being so, I need not consider the other question raised, and therefore conclude that the injunction heretofore issued must be dissolved, the equitable relief prayed for in the bill denied, and the bill dismissed. A decree may be entered accordingly.