22 F.2d 980 (1927)
ST. LOUIS & O'F. RY. CO. et al.
v.
UNITED STATES et al.
No. 7859.
District Court, E. D. Missouri, E. D.
December 10, 1927.
*981 *982 Frederick H. Wood, of New York City, Robert H. Kelley, of Houston, Tex., Leslie Craven, of Chicago, Ill., and Daniel N. Kirby, of St. Louis, Mo. (Cravath, Henderson & De Gersdorff, of New York City, Andrews, Streetman, Logue & Mobley, of Houston, Tex., and Nagel & Kirby, of St. Louis, Mo., of counsel), for petitioners.
Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., for the United States.
Walter L. Fisher, of Chicago, Ill., Oliver E. Sweet, of Rapid City, S. D., and Roland J. Lehman, of Washington, D. C. (P. J. Farrell, of Washington, D. C., on the brief), for the Interstate Commerce Commission.
Before statutory court composed of STONE and VAN VALKENBURGH, Circuit Judges, and FARIS, District Judge.
STONE, Circuit Judge.
The matter here involved is the validity of an order of recapture made by the Commission against the St. Louis & O'Fallon Railway Company (called O'Fallon herein). The order was made on February 15, 1927, upon two hearings held in October, 1924, and July, 1926. The proceeding was against the O'Fallon and the Manufacturers' Railway Company (called Manufacturers' herein). The Commission found no excess net earnings against the Manufacturers' but, as to the O'Fallon, net earnings in excess of 6% for each of four periods; the last ten months of 1920 and the calendar years of 1921, 1922 and 1923, and ordered one-half of such excess for each period to be paid to the Commission on or before a fixed date and the other half to be held by the O'Fallon in a "reserve fund." The body of the recapture order is as follows:
"It appearing, that in compliance with the provisions of paragraphs (4) to (9), inclusive, of section 15a of the Interstate Commerce Act this Commission entered upon an investigation into and concerning the matter of excess net railway operating income of the St. Louis & O'Fallon Railway Company and of the Manufacturers' Railway Company;
"It further appearing, that a full investigation of the matters and things involved having been had, and this Commission having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made a part hereof;
"It further appearing, that no amount of excess net railway operating income was received by the said Manufacturers' Railway Company during the periods covered by the investigation, but that the following designated amounts of excess net railway operating income were received by the said St. Louis & O'Fallon Railway Company for the periods stated:

 March 1 to December 31, 1920, inclusive
 ..................................... $106,755.96
 January 1 to December 31, 1921,
 inclusive ........................... 130,205.13
 January 1 to December 31, 1922,
 inclusive ........................... 106,391.03
 January 1 to December 31, 1923,
 inclusive ........................... 110,409.22

"It further appearing, that under the provisions of paragraph (5) of said section, one-half of such excess net railway operating income is held by the said St. Louis & O'Fallon Railway Company as trustee for the United States; that, under the provisions of paragraph (6) of said section, said one-half of such excess net railway operating income is recoverable by and payable to this Commission within the first four months following the close of the period for which the computation is made; and that, to the extent required by the provisions of paragraphs (6) and (8), the remaining one-half of such excess net railway operating income is required to be placed in a reserve fund established and maintained by said St. Louis & O'Fallon Railway Company;
"And it further appearing, that on March 28, 1924, this Commission, by division 4, announced that interest on amounts of excess net railway operating income payable to the United States under said section would be required at the rate of 6 per cent. per annum, beginning four months after the termination of the period for which the said excess net railway operating income is computed:
"It is ordered, that the amounts of excess net railway operating income which are held by the said St. Louis & O'Fallon Railway Company as trustee for the United States, under the aforesaid provisions, be paid to this Commission in Federal Reserve funds, drawn to the order of the Interstate Commerce Commission and transmitted to George B. McGinty, secretary, Washington, D. C., *983 within 90 days from the date hereof, together with interest thereon as stated below:
"With interest from 

 May 1, 1921 ................ $53,377.98
 May 1, 1922 ................ 65,102.56
 May 1, 1923 ................ 53,195.51
 May 1, 1924 ................ 55,204.61

"It is further ordered, that the remaining one-half of such excess net railway operating income be placed in a reserve fund, as required by paragraph (6) of said section, as aforesaid."
The present bill was filed by both companies to enjoin that order as illegal. The interest of the Manufacturers' in the order against the O'Fallon arises from the contention that, for recapture purposes, the net revenues of the two roads should be considered as derived from "a single system," within the meaning of section 15a, paragraph (6).
The entire order is attacked upon four grounds: (I) Because based upon an erroneous and inadequate finding of value; (II) because the O'Fallon and the Manufacturers' constituted "a group of carriers under common control and management and operated as a single system" within the meaning of section 15a, paragraph (6), of the Commerce Act, as amended [49 USCA § 15a; Comp. St. § 8583a]; (III) because the Commission had not, prior to any of these recapture periods, prescribed the group rates required by section 15a, paragraphs (2) and (3), which, it is claimed, is a prerequisite to any recapture; (IV) because section 15a is void as a delegation of legislative power without any prescribed course of procedure or rules of decision to be followed in the exercise of such power.
The "reserve fund" provision of the order is attacked because (a) section 15a does not impress a trust upon such portion of the excess fund and (b) because section 15a and the order each results in denying full and unrestricted use of what is the private property of the railroad and, therefore, is a taking thereof without due process of law.
There are two lesser contentions: (a) That interest could not be required; and (b) that income arising prior to August 26, 1920, is not subject to recapture.

I. Valuation.

The attack upon the valuation of the property of the O'Fallon is stated to be that the Commission measured such value upon the assumed prudent investment basis and failed to give "effective and dominant consideration * * * to the cost of reproduction at the price levels existing at the time the issue arises." The "issue arises" here as to each of the several recapture periods, to wit, the last ten months of 1920 and each of the calendar years of 1921, 1922, and 1923.
The values found by the Commission for each of these periods were as follows: For the last ten months of 1920, $856,065; for 1921, $875,360; for 1922, $978,874; and for 1923, $978,246. The amount claimed by the O'Fallon as its value during each of such periods is "not less than $1,350,000."
The United States contends that there is no question of confiscation presented here and no need to examine the accuracy of the values found by the Commission or its methods used in determining such values because, even if it might be conceded that the above value claimed by the O'Fallon is correct, yet its net earnings thereon would, less the amount ordered paid over to the government by the order of the Commission, be an ample return thereon for each of the recapture periods.
For the purpose of resolving this contention made by the government, the value of the O'Fallon may be taken, as claimed by it, to be $1,350,000. There is no dispute as to the net earnings (undiminished by any recapture proceeding) as to each of the above four periods. Such earnings were as follows: For the last ten months of 1920, $147,519.89; for 1921, $182,726.73; for 1922, $165,123.47; for 1923, $169,103.98. The amounts ordered paid over to the government for each of these periods respectively were as follows: For the last ten months of 1920, $53,377.98; for 1921, $65,102.56; for 1922, $53,195.51; for 1923, $55,204.61. The sum ordered placed in "reserve fund" for each of such periods was the same in amount as ordered paid over. Thus the amounts affected and controlled by the order for each of the periods was as follows: For the last ten months of 1920, $106,755.96; for 1921, $130,205.12; for 1922, $106,391.02; for 1923, $110.409.22. Subtracting the last amounts from the undiminished net returns for each period leaves, as the net income unaffected by the order, the following: For the last ten months of 1920, $40,763.93; for 1921, $52,521.61; for 1922, $58,732.45; for 1923, $58,694.76. The largest of these balances ($58,732.45) is but 4.35 per cent. of the above assumed value ($1,350,000) of the property. Such a return is obviously insufficient. Therefore it is of controlling importance, as to this contention in this case, to determine two matters: First, whether the return to the carrier in a recapture case is to be measured by the net revenue remaining after deducting *984 both the amount to be paid over to the government and the amount to be placed in the "reserve fund" or is to be measured by the net revenue remaining after deducting only the amount to be paid over to the government. The latter is the contention of the government. That position is based upon an expression of the Supreme Court in the only recapture case which has, so far, been decided by it. In that case (Dayton-Goose Creek Railway Co. v. United States, 263 U. S. 456, at page 486, 44 S. Ct. 169, 175 (68 L. Ed. 388, 33 A. L. R. 472), the court (italics ours) said:
"The act fixes the fair return for the years here involved, 1920 and 1921, at 5½ per cent. and the Commission exercises its discretion to add one-half a per cent. The case of Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U. S. 679 [43 S. Ct. 675, 67 L. Ed. 1176], is cited to show that a return of 6 per cent. on the property of a public utility is confiscatory. But 6 per cent. was not found confiscatory in Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 50 [29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034], in Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 670 [32 S. Ct. 389, 56 L. Ed. 594], or in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172 [35 S. Ct. 811, 59 L. Ed. 1244]. Thus the question of the minimum of a fair percentage on value is shown to vary with the circumstances. Here we are relieved from considering the line between a fair return and confiscation, because under the provisions of the act and the reports made by the appellant the return which it will receive after paying one-half the excess to the Commission will be about eight per cent. on the reported value. This can hardly be called confiscatory. Moreover the appellant did not raise the issue of confiscation in its bill and it cannot properly be said to be before us."
While the court said that the issue of confiscation was not raised in that bill and that such issue "cannot properly be said to be before us," and, therefore, the above italicized expressions may be regarded as a dictum not necessary to a decision of the case, yet we cannot say that it does not represent the view of that court as to that matter. Whatever might be our independent view as to the inclusion of the "reserve fund" portion with the net revenue left unrestricted with the carrier and the determination that such combined sum is to be taken as the "return" by which confiscation is to be measured, we do not feel free to disregard this seemingly clear and deliberate statement that such combined sum is such measure. Because that is the measure and the only measure so far given by the Supreme Court in a recapture case, we feel obligated to accept it as the rule of law to be applied by us herein.
The second matter to be determined is the result from applying this rule of law to the facts as shown by the evidence. Applying this measure to the undisputed evidence, such return for each of the recapture periods is as follows: For the last ten months of 1920, $94,141.91; for 1921, $117,624.17; for 1922, $111,927.96; for 1923, $113,899.37. These amounts give a percentage return for the respective periods upon the value ($1,350,000) claimed by the carrier as follows: For the last ten months of 1920, 6.97+ per cent.; for 1921, 8.71+ per cent.; for 1922, 8.29+ per cent.; for 1923, 8.43+ per cent.
While the question of what suffices to constitute a "fair return," in a confiscatory sense, varies with circumstances (Dayton-Goose Creek Ry. v. United States, 263 U. S. 456, 486, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472), yet the Supreme Court in that case (page 486 [44 S. Ct. 175]) held that a return of "about 8 per cent." could "hardly be called confiscatory" and said that a return of "6 per cent. was not found confiscatory in Willcox v. Consolidated Gas Co., 212 U. S. 19, 48, 50 [29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034], in Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 670 [32 S. Ct. 389, 56 L. Ed. 594], or in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172 [35 S. Ct. 811, 59 L. Ed. 1244]." These statements from the Dayton-Goose Creek Case would clearly eliminate the returns (more than 8 per cent.) on the O'Fallon for the years 1921, 1922 and 1923. That case would seem, also, to eliminate the return (6.97 per cent.) on the O'Fallon for the last ten months of 1920, because that case was a recapture case and the above expressions of the court concerning the percentage of return were made, in part, concerning a recapture for the same period (last ten months of 1920) involved in this case.
From the above law and facts, it seems that this contention of the United States is well founded; that the verity of the Commission's valuation herein need not be examined and cannot affect this recapture order; and, therefore, that such order is not open to attack upon the ground of wrongful valuation. If this be true, it is unnecessary to examine and determine the various contentions made *985 by the parties and amici curi concerning the proper manner of ascertaining value herein.

II. System Operation.

Section 15a, paragraph 6 (41 Stat. 489), contains a provision that:
"For the purposes of this paragraph the value of the railway property and the net railway operating income of a group of carriers, which the Commission finds are under common control and management and are operated as a single system, shall be computed for the system as a whole irrespective of the separate ownership and accounting returns of the various parts of such system."
This proceeding was against both the O'Fallon and the Manufacturers'. The Commission found excess earnings for the O'Fallon and found none for the Manufacturers'; also the Commission found a common control and management, but not a single system operation of the two carriers. Therefore it denied them the application of the above statutory provision. Both carriers contend that such denial was error and that they do, within the above statute, constitute such a single system.
The United States challenges the jurisdiction of this court to examine this question. This challenge is not well made. The statute laid down the rule. It was the duty of the Commission to apply that rule to the evidence before it and to reach and state a resulting conclusion. That conclusion affects the legal rights of these carriers as fixed by the statute. The carriers claim here that this conclusion of the Commission was based upon no evidence; therefore, that conclusion is judicially examinable, at least to the extent to ascertain whether it was the result of arbitrary action by the Commission  that is, whether the conclusion was reached without the necessary basis of evidence. Northern Pacific v. Dept. Public Works, 268 U. S. 39, 44, 45, 45 S. Ct. 412, 69 L. Ed. 837; Ohio Valley Co. v. Ben Avon Borough, 253 U. S. 287, 297, 40 S. Ct. 527, 64 L. Ed. 908; Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308.
The statutory requirement is that, to be entitled to treatment as a "group," the carriers must be "under common control and management" and must be "operated as a single system." Whether such requirements exist is a matter of fact to be determined from the evidence. There is no substantial contradiction in the evidence, but the difference arises mainly from the conclusion of ultimate fact to be deduced from the evidence. There is little room for such difference in so far as "common control and management" is concerned, for the evidence is clear that the Adolphus Busch estate owns a large majority of the stock of both carriers and that there is a common executive and office force which handles and controls the business of each. The real point of difference is whether the two are "operated as a single system." The evidence upon this point is well stated in the report of the Commission as follows:
"The Manufacturers' owns and operates about 30 miles of track in St. Louis, of which 5 miles are classified as main track and 25 miles as sidings or industrial tracks. Its construction was commenced in 1887 by the interests which controlled the Anhuser-Busch Brewing Association. The Manufacturers' is purely a switching road, moving cars between various industries and the trunk lines, or the line of the Terminal Railroad Association of St. Louis, hereinafter called the Terminal. It issues no waybills, but issues receipts to shippers and transmits bills of lading to the trunk lines by which regular waybills are made out.
"The O'Fallon operates about 9 miles of main line and 12 miles of yard track and sidings in Illinois, the former extending from coal mines owned by the Adolphus Busch estate westward to a connection with the tracks of the Terminal in East St. Louis. Its traffic is almost exclusively coal in carloads, which is distributed widely through the Northwest, moving from origin on regular billing. Through the medium of the Terminal its shipments are delivered at various points in St. Louis, some of which are on the tracks of the Manufacturers'. Control of the O'Fallon was acquired by the Busch interests in 1913. The industries of the controlling interests have never used more than 8 per cent. of the coal shipments from the O'Fallon. The distance between the railroad of the O'Fallon and the railroad of the Manufacturers' is about 12 miles, and communication by rail between the two properties is effected over the tracks of the Terminal, including a bridge over the Mississippi river. Upon the completion of a new bridge, referred to as the municipal bridge, it is proposed to construct tracks which will effect direct physical connection between the Manufacturers' and the O'Fallon, and, in preparation for this development, the O'Fallon has acquired and holds about 30 acres of land near the eastern approach of the new bridge. These carriers operate engines and other equipment from one line to the other over intervening tracks hereinbefore described, *986 but there is no written contract or other arrangement for such use, and a special arrangement is necessary for each movement. Due to the difference in traffic handled by the Manufacturers' and the O'Fallon, there is no occasion for regular through operation of trains over the lines of these carriers."
"The general offices are located in St. Louis. There is an engine repair shop located on the Manufacturers' in St. Louis and the O'Fallon has a car repair shop on its line. Repair work on equipment for both carriers is done at these shops as well as similar work for other carriers. Work done for either carrier in the shop of the other is charged for the same as for work done for any other carrier. The rates to and from points on the Manufacturers' are the St. Louis rates, to which the Manufacturers' is a party, and out of which it gets revenue in the form of a switching or terminal charge which is absorbed by the line-haul carrier. The O'Fallon is also a party to many joint rates with trunk lines. The companies render separate operating reports to us. The above statement of facts is applicable, without material modification, to the entire period of three years and ten months covered by this investigation."
"Only a very small percentage of the traffic originating on the O'Fallon moves to points on the Manufacturers', and practically no traffic moves from the Manufacturers' to the O'Fallon. There is no common financial responsibility or intermingling of financial obligations and benefits as between the two carriers."
To this statement it may be added that the O'Fallon was acquired by the Busch interests with the apparent purpose of connecting it up with the Manufacturers' and thus furnishing a complete system consisting of connected terminals on both sides of the river, but this has never been done and was not the situation at the time of these recapture periods. This evidence seems to justify the conclusion of the Commission that "they stand apart in physical location, in the character of traffic handled, in the conduct of their financial transactions. * * *" A mere short gap in physical connection might not be sufficient to prevent these carriers being regarded as "a single system" within the statutory meaning. But where such gap exists, and thereto is added the consideration that there is no common traffic moving one way over the two carriers and only a small percentage the other way, it is difficult to believe that the two are operated as the "single system" intended by the statute; also, there is no financial interdependence between them, so that the low earnings of one corporation can be aided or recouped by the other.
It is strongly urged that there is an actual physical or at least a legal connection between the two roads arising from the fact that the Terminal Railroad Association, which owned and operated the trackage between these two carriers, was declared to be the "agent" and "servant" of the roads with which it connected in the so-called Terminal Railroad Cases (U. S. v. Terminal R. R. Ass'n, 224 U. S. 383, 32 S. Ct. 507, 56 L. Ed. 810; Id., 236 U. S. 194, 35 S. Ct. 408, 59 L. Ed. 535; Terminal R. R. Ass'n v. U. S., 266 U. S. 17, 45 S. Ct. 5, 69 L. Ed. 150). It may be that, for the legal purposes involved in those cases, the Terminal is an agent or servant of every road connecting with it which uses its facilities. But we are dealing now with a matter of statutory construction  the question being whether, in this statute, "operated as a single system" was meant to include such a situation as is here present. The fact of a mere physical break in the trackage does not seem to us to be determinative. The Wabash, which goes both East and West from St. Louis, might, within this statute, be a "single system," even though there be a short break in its physical connection. Such conclusion might not be affected, even though that break is bridged by an entirely independent carrier, if the only place therein of such independent carrier is that of transfer from one Wabash trackage to another. But here these two carriers have no traffic-carrying or operating unity, except for the small amount of coal delivered to the Manufacturers' from the O'Fallon and no financial interdependence. Therefore, we think, the Commission correctly held these two carriers not to be "operated as a single system" within the meaning of this statute.

III. Rates under Section 15a as Prerequisite to Recapture.

This contention is that paragraphs (2) and (3) of section 15a require the Commission to fix rates in a group of carriers so that the earnings of such group carriers shall, "as nearly as may be," yield a fair return upon the aggregate value of such carriers and shall from time to time determine what percentage upon such value will produce such fair return; that, until such rates are fixed and operative, there can be no recapture of earnings from any carrier within such group; *987 that no such rates had been established at the periods covered by this recapture order; and that the aggregate earnings for all the carriers in the group in which the O'Fallon falls were, for these recapture periods, less than the temporary percentage allowed thereon by paragraph (3).
The recapture provisions are in paragraphs (5) to (16) inclusive and paragraph (18) of the section. Of such paragraphs, (5) and (6) are here important. Paragraph (5) provides that the earnings of any carrier in excess of the percentage established under paragraph (3) by the Commission shall be subject to recapture. Paragraph (6) fixes a maximum percentage of 6 per cent. beyond which earnings are to be regarded as an excess and may be recaptured.
Paragraphs (2) and (3) relate to fixing of rates, having in view all of the carriers of a group. Paragraphs (5) and (6) have to do with recapture of excessive earnings from individual carriers. We see no necessary nor logical dependence of the latter upon the former and we find no expression nor implication in the section leading to such result. The only relation between these paragraphs seems to be that the percentage fixed by the Commission under paragraph (3) as constituting a "fair return" shall, under paragraph (5), measure "fair return" (therefore, excess earnings) for recapture purposes, with a maximum percentage limitation of six per cent. under paragraph (6). Here, the recapture is sought for the claimed excess above the maximum percentage of "fair return" permitted by paragraph (6); hence no percentage fixed or not yet fixed by the Commission under paragraph (3) for earnings by the group can have any effect upon the rights of this carrier.
Also, there may be significance in the provision of paragraph (3) fixing a temporary percentage of return for two years beginning March 1, 1920. Obviously, one purpose of this provision was to bridge the period following the effective date of this act (approved February 28, 1920) during which the Commission should, under paragraphs (2) and (3), form the carriers of the country into groups and determine the percentage constituting "fair return" under paragraph (3). Since the only connection between paragraphs (2) and (3) and paragraphs (5) and (6) is the percentage constituting fair return, the above provision is, at least, persuasive that the Congress intended thereby expressly to remove all thought of suspension of operation of paragraphs (5) and (6) until after determination by the Commission of the percentage of return under paragraph (3).
This contention of appellants must be denied.

IV. Procedure.

It is contended that section 15a is invalid as a delegation of legislative power without prescribing a method of procedure. The section defined the duties of the Commission as to fixing rates, declared what should be excess income subject to recapture, the disposition to be made by the Commission of the recaptured funds coming into its hands and the disposition of the portion going into the "reserve fund" left with the carrier. As to recapture it fixed a maximum percentage of return as a basis of earnings and directed the Commission as to the ascertainment of property value to which that percentage should apply. In short, the section set out completely the legislative rules. The only duty left to the Commission was the ascertainment of the facts in each case to which those rules were to be applied by it. It left the Commission no discretion as to the application of those rules of law to the facts found by it. Therefore, no legislative power was delegated. United States v. Grimaud, 220 U. S. 506, 516, 31 S. Ct. 480, 55 L. Ed. 563. The section (paragraph 9) authorizes the Commission to "prescribe rules and regulations for the determination and recovery of the excess income payable to it," having in mind the mere administrative procedure before it (such as hearings, notices, etc.) having to do with the ascertainment of the matters of fact committed to it by the section. Moreover, a full hearing was had herein.

V. The "Reserve Fund."

After requiring that one-half of the excess earnings found by it for each of the recapture periods be paid over to the Commission, this order of recapture contained a provision "that the remaining one-half of such excess net railway operating income be placed in a reserve fund, as required by paragraph (6) of said section, as aforesaid."
This provision of the order is attacked upon two grounds. The first of these grounds is that section 15a does not impress a trust upon such portion of the excess earnings. Paragraph (6) provides that such portion of the excess earnings "shall be placed in a reserve fund established and maintained by such carrier." Paragraph (7) provides that the carrier can use this fund for no "other purpose" than to supply dividend deficiencies, up to 6 per cent., of subsequent *988 years. Paragraph (8) provides that such fund need be maintained only up to 5 per cent. of the value of the carrier. The purpose of these provisions is obvious. It is to segregate a special fund, of a stated maximum, for a prescribed purpose. It is of no moment whether this be denominated a trust or not. The intention is clear and the only question is one of legislative power.
The second ground for challenging this portion of the order is that it denied the full and unrestricted use to the carrier of what was its private property. The Dayton-Goose Creek Case, supra, page 484, has determined that Congress had power to hold the carrier to a reasonable return and to control all excess thereover. If that power extends to entirely taking from the carrier one-half of such excess, as there held, it more clearly would cover limitation of use by the carrier of the other half.

VI. Interest.

The order of the Commission required payment of the recapture amount for each of the various periods with interest thereon at 6 per cent. from a time four months after the end of such period. The allowance of any interest is challenged. The section (paragraph 6) requires one-half of the excess earnings to be paid over to the Commission "within the first four months following the close" of the recapture period. Evidently, it was upon such provision that the Commission based its claim of power and right to require interest from the end of such four months period. While this provision obligated the carrier to pay over within the four months, yet where there is, as here, a bona fide contention that there was no excess earned, no liability for interest could arise until it had been ascertained whether and in what amount there was an excess to be paid over.
The carrier contends that such liability is not ascertained, or liquidated, until it has been determined judicially. We think the section (paragraphs 4, 6 and 9) made it the duty of the Commission to determine, the amount due and that, where there is a dispute, such determination is a liquidation of such for interest purposes. Therefore, the Commission erred in requiring interest from four months after the respective recapture periods but not in requiring interest. The order should be modified to require interest from the date when, under the order, the payments found due by the order should be made  this was 90 days after date of the order, entered February 15, 1927.

VII. Period March 1 to August 26, 1920.

It is contended that, in no event, could there be recapture for the period between March 1, 1920, and August 26, 1920. This contention is, in a reduced form, the same as treated above under heading III. It is that prior to August 26, 1920, this carrier received no income under the provisions of section 15a (paragraph 2) because the increased rates installed thereunder did not become effective until that date. As said above (heading III) the section seems to fix March 1, 1920, as the beginning of the time for recapture and the fixing of rates (under section 15a or otherwise) has no effect upon that matter.

Conclusion.
The order should be modified to allow interest on each of the amounts found by the Commission from June 17, 1927, and as thus modified should be sustained.
It is so ordered.
FARIS, District Judge (concurring).
I concur in the result reached in the opinion of Judge STONE, and concur fully in the views expressed as to the matter of interest overcharge. I also agree with the conclusion that the plaintiffs' railways do not constitute under the law upon the facts a "single system," "under common control and management," and "operated as a single system." It may well be that here the findings of the Interstate Commerce Commission upon this point are not reviewable by this court. But the latter point need not be ruled; for, while it may, at least arguendo, be conceded that plaintiffs' railways are under "common control and management," the facts do not, in my opinion, show that they are "operated as a single system." Under subdivision (6) of section 15a of the Interstate Commerce Act, as amended by the Transportation Act, passed on February 28, 1920 (41 Stat. 488), both of these verities must contemporaneously exist; since, upon the facts, here but one of them is present, the plaintiffs' railways constitute, for recapture purposes, two separate entities. I shall (for brevity's sake) call the complaining plaintiff O'Fallon simply.
I concur in the view that the Interstate Commerce Commission (hereinafter called Commission) did not err in considering as a part of the recapture period the last ten months of the year 1920; that is, the ten months of the year 1920, following the effective dates of the Transportation Act and of section 15a of the Interstate Commerce Act (allocated to the latter act, but enacted as a *989 part of the former act). It may be true, as plaintiffs contend, that technically no carrier received any income under the provisions of section 15a, because no increase of rates and no adjustment of rates were formally made or authorized, till the order of the Commission of August 26, 1920. Reduced Rates, 1922, 68 Interest. Com. Com'n R. 676. But since the recapture provisions took effect, when the Transportation Act became the law, that is, on March 1, 1920, and since the O'Fallon earned money subject to recapture without any increase or adjustment of rates, it is my opinion that it cannot take advantage of this situation, even though some of the carrier members of the group to which it is allocated might have been entitled to an adjustment, or an increase of rates which they did not get before the order of August 26, 1920.
Plaintiffs contend that confiscation has happened by reason of the use of elements of valuation not in accord "with the law of the land," which concededly, at least among other things, is to be regarded in reaching a valuation of the properties of O'Fallon used in the service of transportation. On the other hand, the government and the Commission contend that upon no view is confiscation present, for that the matter is merely one wholly solvable by a proper construction of the apposite statutes. It may be conceded that, if the contentions of the Commission and the government both as to the law and the facts in the case are correct, there is no confiscation. But, if plaintiffs' contentions in such behalves are correct, I think confiscation is obvious. So the case differs upon the point in a way in no wise unique or contrary to the ordinary case, wherein constitutional questions are urged by the one party and combatted by the other, and so the insistence of the defendants seems a begging of the question.
Defendants use this mathematical formula in demonstration of this contention, to wit: "For 1922, 6 per cent. on $978,874, the value found by the Commission, is $58,732.44. For 1922, the net railway operating income was $165,123.47. Subtract the $58,732.44 and the difference is $106,391.03. One-half is $53,195.51. Add $58,732.44 and $53,195.51, and the sum of $111,927.95 is O'Fallon's share. That amount is equivalent to 11.43 per cent. on $987,874, and 8.29 per cent. on $1,350,000, the value alleged by O'Fallon in the amended petition."
Adopting the identical formula, but using the valuation of $1,350,000, contended for by plaintiffs, the final figures reached are $123,087.44, instead of $111,927.95, which is about 9 per cent. on the valuation for which plaintiffs contend. Subtracting $123,087.44 from $165,123.47, which is the net operating income for the year 1922, the result is $42,136.03, which the Commission should have enacted; whereas, it seeks to take, for the year 1922, $53,195.51.
With deference, however, I think the formula has been carried too far. The controlling final figures would have resulted, had the wholly unnecessary final addition and final subtraction not been done. For example: Six per cent. of $1,350,000 is $81,000; the net operating income for the year 1922 was $165,123.47. Subtract from such income the $81,000, which plaintiffs contend the O'Fallon is entitled to, and there is left the sum of $84,123.47 only, subject to treatment for recapture purposes, one-half of which is $42,061, in round numbers; yet the Commission seeks to take $53,195. In my opinion there thus appears a clear confiscation of some $11,000, provided the methods of valuation used by the Commission were not in accord with the rules and elements which serve to make up the law of the land. Since the matter of rate making is not involved, I think the question is not one as to what money O'Fallon was allowed to keep, but one of what money was taken away from it. And this condition exists, regardless of whether the burdens and restrictions put upon the moiety of $42,061 left in O'Fallon's hands constitute confiscation of that money or not.
I am unable to avoid the conclusion that the restrictions put by section 15a of the Transportation Act, on the use of that one-half of the surplus of annual earnings above 6 per cent., which is left in the carrier's hands, is at least a form of confiscation. But it is not, in my opinion, necessary to decide whether such burdens and restrictions saddled by the act on this moiety constitute confiscation. The matter well may be permitted to rest on the taking of the $11,000, through an alleged application of illegal elements in reaching the value of O'Fallon's properties used in the service of transportation.
If the alleged fact of confiscation includes the contention that such confiscation exists here, because the O'Fallon's physical properties were not valued by a consideration of the identical elements used in valuing real estate and ordinary chattels, I think the answer lies in the inherent differences in the nature of the two sorts of properties, and that confiscation does not arise from the mere fact of the use of different methods. Certainly, *990 this is true if in their nature the two sorts of properties cannot be valued fairly as to either, if the identical rules be used. I am of the opinion that the latter situation is presented by the facts, for reasons and conclusions I have hurriedly set down.
The question here, I repeat, is one of valuation for recapture of profits purposes, and not one of valuation for rate-making purposes. The matter of valuation for rate-making purposes is involved incidentally and in a way adventitiously only. With deference, then, I am of the view that this court cannot avoid the necessity of meeting the question of legal methods of valuation vel non, face to face. Again with deference, I am constrained to the view that what was said in the case of Dayton-Goose Creek Ry. v. United States, 263 U. S. loc. cit. 486, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472, was obiter dictum, and clearly meant to be so, by the distinguished and learned writer of that opinion. Moreover, in the Dayton-Goose Creek Case, the correctness of the valuation was not attacked, but at least tacitly conceded.
No excusable reason exists for adding to the length of these views, by setting out the reasons for the positions I take, upon the below propositions. I content myself by saying that my opinion is:
(a) That from the case of Smyth v. Ames, 169 U. S. loc. cit. 546, 547, 18 S. Ct. 418, 42 L. Ed. 819, to the last utterance of the Supreme Court of the United States, no hard and fast rule has ever been laid down by that court touching the manner of the valuation of the properties of railroads, used in the service of transportation.
(b) That the provisions of section 15a of the Transportation Act and 19a of the Interstate Commerce Act, as amended (49 USCA § 19a; Comp. St. § 8591), are parts of "the law of the land," to which some reference must be made and much deference must be given.
(c) That section 15a of the Transportation Act, considered, as it requires, in connection with section 19a of the Interstate Commerce Act, as amended, inevitably contemplates, both from the language used and from the standpoint of practicability, one basic valuation, which shall stand as such so long as the law itself shall continue in force.
(d) That to this basic valuation, and in order to keep it up to date, there must be annually added increments accruing to capital, on the basis of the prudent investment value of such increments.
(e) Therefore a valuation arrived at by the sole use of either the prudent investment theory, bottomed upon cost when constructed, or upon the theory of the present cost of reproduction new, less depreciation, would work presently to the public and eventually to the carriers themselves such monstrous inequity as to preclude wholly the use of either of such methods exclusively, and eliminate the notion that Congress contemplated the exclusive use of either of such methods.
(f) That the Transportation Act and the apposite provisions of the Interstate Commerce Act constitute a radical departure from ancient policies, by which, in a way, the United States went into a sort of partnership with all of the carriers affected by it, but yet left other and local public utilities, though impressed with a public interest, wholly unaffected by the act.
(g) That this difference is inherent and arises, inter alia, from the absolute necessity annually to value the properties of all carriers subject to the provisions of the act (and which, as to many of them, would be physically and wholly impossible, without using a basic value, fixed once for all time), and the lack of necessity so to value annually, if ever, local light, power, gas, water, telephone, and other such public utilities.
(h) That the "law of the land," considered apart from the provisions of the Transportation Act and sections 15a and 19a of the Interstate Commerce Act, and excluding pretium affections as irrelevant, provides but two tests, or measures of value, to wit, value in use and value in exchange.
(i) That the test of value in use is inapplicable, because of the provisions of the Transportation Act and sections 15a and 19a, supra (now allocated in the Code to the Interstate Commerce Act), and because, for rate-making purposes, it involves the so-called vicious circle, whereby, the more a carrier earns, the more it would be entitled to earn, and so hence to infinity.
(j) That, for all practicable purposes, value in exchange cannot be considered because of the conceded impossibility of procuring a buyer for a great railroad property, at its actual value or at either its prudent investment value or its value arrived at by taking the present reproduction cost, less depreciation.
(k) That value in exchange is tantamount to fair and reasonable market value, which is made up of expert opinion, but which is not necessarily dependent, upon either original cost, or the cost of reproduction new at the time of sale, or at the time of the valuation.
And (l) therefore the value of the physical properties of a common carrier under the *991 recapture provisions of the Interstate Commerce Act ought to be the net result of expert opinion, reasonably and honestly exercised (and informed by a consideration of the information required by statute to be obtained), as is to be deduced from a fair analysis of the items considered and of the methods employed in the valuation, and the items considered and the methods employed should, in addition to the use in the valuation of the statutory information (section 19a, subd. (b), Interstate Commerce Act, as amended February 28, 1920, and June 7, 1922), take into consideration the average of known price levels for both labor and materials over a fair term of years preceding the valuation, as well as for a fair term of years thereafter, based on the trend of such levels according to historical observation and human experience.
Concededly, as to ordinary goods and chattels, as well as to real estate (touching which latter the doctrine of present value was followed, and as to which there is here no controversy), the owner, as he must bear decreases in value or price, is by the same token entitled to all increases in value. This, as to such commodities, may be conceded to be "the law of the land." But all such commodities have either or both value in use and value in exchange; nor are they hedged about by the provisions of the Transportation Act and the apposite clauses of the Interstate Commerce Act. Railroads are under the existing law and policy governed by these acts, and they have (certainly for rate-making purposes, and the identical yardstick, perforce these acts measures and governs both rate-making and recapture bases values) neither value in use as the sole test of value, nor value in exchange.
Obviously, the statute itself (section 19a, supra), in requiring examination, in the work of valuation, into "the net and gross earnings" of the railroad being valued, fairly commands consideration of the element of value in use. But the element of value in use is not the sole test enjoined, either under the above statute, or outside of it, and by the law of the land. I think it must be conceded that carriers, under the recapture provisions of the Transportation Act, have a value in use. But such value is not the sole test; it is only to be considered among other things. If it were the sole test, then since, upon what I conceive to be the weight of authority and the reason of the thing, it cannot be so used in valuation for rate-making purposes, it would be necessary to take the arbitrary view that valuation for recapture of profits purposes is paramount; for but one valuation for both purposes is contemplated by the statutes. Certainly it was not intended by the Congress that separate valuations employing different elements of value should be made.
Briefly, I am constrained to reach some of these views from the fact that, perforce the provisions of section 15a of the Interstate Commerce Act, the Commission is permitted to "utilize the results of its investigation under section 19a of this act, so far as deemed by it available." As aids to the valuation of the "property owned or used by every common carrier," under the provisions of section 19a of the act, a vast amount of information is required to be obtained by the Commission, embracing, inter alia, original cost to date; the cost of reproduction less depreciation; an analysis of the methods by which such costs are obtained, and the reasons for any existing differences, if any; the history and organization of the present or any predecessor corporation; any increase or decreases of stocks, bonds, or other securities and the money received therefor; the net and gross earnings of the corporation; the moneys expended and for what purpose expended; the amount and value of any aid, gift, donation, or grant of right of way, by any individual, or by the government, any state, county, or other municipality, as well as the disposition thereof and/or of the money derived therefrom. See subdivisions first, second, third, fourth, and fifth of section 19a, supra.
Paragraph (f) of subdivision fifth of section 19a, supra, says: "Upon the completion of the valuation herein provided for the Commission shall thereafter in like manner keep itself informed of all extensions and improvements or other changes in the condition and value of the property of all common carriers, and shall ascertain the value thereof, and shall from time to time revise and correct its valuations, * * * which valuations, both original and corrected, shall be tentative valuations." But tentative alone in the sense that notice thereof must be given and protests, if any, heard; but upon giving notice, as provided for in paragraph (h) of subdivision fifth of section 19a, supra, and absent protest from either the state or the carrier itself, within 30 days, such valuation becomes final.
Upon the above provision, and upon the obvious physical fact that the annual valuations, which must be made for recapture of profits purposes, would, as to a great railroad system, be so impracticable as to be impossible, and would thus utterly preclude the enforcement of the recapture provisions of *992 the act (which provisions are characterized as the heart of the act), I base the conclusion that a basic valuation, once for all time, must inevitably have been contemplated by the Congress.
For the above reasons and conclusions, I am not convinced that the Commission erred, but am of the opinion that it reached the valuation found by it in the only way possible, in a situation so difficult as that absolute certainty and correctness is well-nigh finitely impossible.
Therefore I concur in the result.